## NORTH AMERICAN ACC. ASS'N v. ADAMS.
### No. 8486.

Court of Civil Appeals of Texas. San Antonio.

Oct. 29, 1930.

Rehearing Denied Nov. 26, 1930.

John H. Mitchell, of La Feria, for appellant.

J. M. Mothershead and E. L. David, both of Harlingen, for appellee.

FLY, C. J.

This is a suit instituted by appellee against appellant for $630 alleged to be due on a policy of insurance against accidents, issued to her husband, Amos A. Adams. It was alleged that an accident occurred to said Amos A. Adams, and as a result thereof he lost his life.

The cause was tried by jury, and, upon their answers to special issues submitted to them by the court, judgment was rendered against appellant for $996.66.

There is but one question presented, that of proximate cause, and the solution of the question must depend very largely upon the consideration and proper application of the facts. The latter are not numerous or complicated. Amos A. Adams, a farmer, lived near a railroad track, and on May 8, 1929, left his home to go to the headgate to turn on the water to irrigate. He was 66 years of age, and rode a skittish horse that was nervous about trains. He went south from his house along a road which ran between the railroad track on the one side and a ditch on the other. While riding along this road, he saw a short freight train approaching, and, knowing the fear the horse had of trains, he dismounted and held the horse by the bridle reins. The train running at a low rate of speed approached, and the horse became restive and excited and pulled back with great vigor and backed on the track. The horse was struck by the engine, the bridle reins were broken, and Adams was thrown to the ground. The latter, in response to a question from his wife, said the horse kicked him on the arm, where a bruised place was seen. A Mexican witness of the accident, however, stated that the horse "kicked"

Adams with one of his forelegs. The horse was badly hurt and afterwards died. The train was immediately stopped and Adams placed thereon. It was then backed to Adams' house, which was near the track, not more than a mile and probably less distant. The employees carried him into the house. He was not unconscious, but in a dazed condition. Blood was running from his nose and mouth, and there was a bruise on his right arm, which he attributed to a kick by the horse. Adams after the accident went about his duties on the farm, although not feeling well, until about two weeks thereafter, when he complained about his nose and sneezed a great deal. After suffering for two or three days with his nose, it became so painful that his wife sent for a physician, who came and administered medicine, but the pain continued, and on May 26, 1929, eighteen days after the accident, the doctor was shown a worm that had come from Adams head when he sneezed. The doctor immediately investigated and took over a hundred full-grown screw worms from the upper nasal cavities and the roof of the mouth. No other doctor examined Adams, and he swore that the worms caused the death of the man. It was therefore shown by the undisputed evidence that the death was not caused by the wounds received at the time of the accident, but by matters occurring over two weeks thereafter. Veterinarians swore that the eggs deposited by the green fly would incubate in from nine to twenty-four hours after being deposited, and were usually deposited on wounds or abrasions of the skin, or possibly on delicate tissues, such as the inside of the nose or mouth. It was stated that the screw worm reached its maturity in ten days and dropped from the place where it had grown to the earth, where it was transformed into a fly, which in turn deposited eggs in the continuous wonderful circle of existence.

Proximate cause is usually a question of fact, and, whenever a jury has determined the proximate cause of death or injury, such determination will be binding on courts, unless it is plainly in violation of common sense, reason, and law. Mexican Nat. R. Co. v. Mussette, 86 Tex. 708, 26 S. W. 1075, 24 L. R. A. 642. The proximate cause need not be the sole cause, nor the one nearest to the injury. Proximate cause is elaborately discussed, and many authorities reviewed by this court in the case of Shippers' Compress Co. v. Davidson, 35 Tex. Civ. App. 558, 80 S. W. 1032, 1033, and a quotation from that opinion will obviate a discussion of the question. This court held:

"The question then of prime importance is, was the erection of the obstruction in the street the direct and proximate cause of the death of W. I. Davidson? The proximate cause is not necessarily the one nearest to the event, but the primary cause may be the one proximately responsible for the result, although it may operate through one or more successive instruments. If the primary cause was so linked and bound to the events succeeding it that all together they create and become one continuous whole—the one event so operating upon the other as to tie the result to the primary cause—the latter will be the proximate cause of the injury. If there is some new and independent cause, disconnected from the first or original cause, operating in itself, which intervenes to produce the result, the chain of sequence will be broken, and the primary fault cannot be held to be the direct and proximate cause of the injury. As said in Gonzales v. Galveston, 84 Tex. 3, 19 S. W. 284, 31 Am. St. Rep. 17: 'By "proximate cause" we do not mean the last cause, or nearest act to the injury, but such act, wanting in ordinary care, as actually aided in producing the injury as a direct and existing cause. It need not be the sole cause, but it must be a concurring cause, such as might reasonably have been contemplated as involving the result, under the attending circumstances.'"

The evidence disclosed that there was blood on the nose and mouth of Adams on May 8, and the presumption might be indulged that it was washed off and kept free from blood by the good wife who was ministering to his wants and necessities. The presence of blood or any abrasion of the skin was not shown after the day of the accident until blood began to flow from the wounds inflicted by the worms. It is clear, therefore, that the infestation of the worms did not arise from the blood that flowed from the nose on May 8, and there is an utter failure to show a causal connection between the blood produced by the fall and the deposit of the larvæ of the flies, and the proof fails to show that such deposit was the direct result of the accident when Adams was thrown to the ground by his horse. More than two weeks had elapsed between the time of the accident and the time when the eggs of the fly must have been deposited. Under the facts, the fly could not have deposited its eggs in the very brief space of time elapsing between the accident and the time when Adams was lifted from the ground and carried to and deposited in his home. When or where the infestation took place is not shown, but it was necessarily not more than twenty hours before the larvæ became worms and caused Adams to sneeze. No causal connection was shown between the accident and the attack of the worms. If the matter of anticipation could possibly be considered in the case of an insurance company, it would have taken all the ingenuity of Poe's "Angel of the Odd" to have imagined such a state of facts as arose in this case.

The judgment will be reversed, and the cause remanded.